**Dewey WHITMORE, Plaintiff,**

v.

**Jo Anne B. BARNHART, Defendant.**

**No. Civ.05 190 SLR.**

United States District Court,
D. Delaware.

Jan. 9, 2007.

---

John S. Grady, Grady & Hampton, Dover, Delaware, for Plaintiff.

David F. Chermol, Office of Regional Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Presently before the court is a complaint filed by Dewey Whitmore ("plaintiff") on March 21, 2005 (D.I.2), seeking review of the final decision of defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration, denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383(f). Plaintiff has filed a motion for summary judgment asking the court to reverse defendant's decision and award him benefits. (D.I.12) Defendant has likewise filed a motion for summary judgment and requests that the court affirm her decision. (D.I.15) The court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).[1]

---

1. Under § 405(g),

 [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision.... Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides....

42 U.S.C. § 405(g). Likewise, § 1383(c) states that "[t]he final determination of the Commissioner of Social Security after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." Id. § 1383(c)(3).

## II. BACKGROUND

### A. Procedural Background

Plaintiff filed his first application for SSI in July 2002, alleging an onset date of May 1, 2002. (D.I. 10 at 78, 90) His request was denied on September 17, 2002. According to the Administrative Law Judge ("ALJ") who later held a hearing on plaintiff's second SSI claim, "there is no record of any further administrative appeal on [the July 2002] claim." (Id. at 12) Plaintiff filed a second application for SSI on May 21, 2003, claiming that, as of June 23, 2002, he had been unable to work because of "[s]eizure/cluster headaches/vertigo, chronic headaches, carpel [sic] tunnel, depression, chronic sinusitis, tintinitis, chronic pressure [and] pain in [his] left temple." (Id. at 82, 104, 107)

Plaintiff's application was denied both initially and upon reconsideration. (Id. at 12) He made a timely request for a hearing before an ALJ, which was held on October 20, 2004. (Id.) Both plaintiff and an independent vocational expert testified at the Administrative Law Hearing (the "Hearing"). (Id.) On October 28, 2004, the ALJ found that, "based on the application filed on May 21, 2003, [plaintiff] is not eligible for Supplemental Security Income payments under [§ 1381a[2]] and [§ 1382c(a)(3)(A)[3]] of the Social Security Act." (Id. at 20) The ALJ made the following findings:

1. [Plaintiff] has not engaged in substantial gainful activity since the alleged onset of disability.

2. [Plaintiff's] left carpal tunnel syndrome, seizure disorder, chronic sinusitis with headaches and history of alcohol abuse in remission are considered "severe" based on the requirements in the [Code of Federal Regulations[4]] (20 CFR § 416.920(b)).

3. These medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. . . . [Plaintiff's] allegations regarding his limitations are not wholly credible for the reasons set forth in the body of the decision.

5. [Plaintiff] has the following residual capacity: Stand/walk for 6 hours in an 8–hour workday, sit for 6 hours in an 8–hour day, and lift 50 pounds occasionally and 25 pounds frequently. The claimant is restricted to no climbing of ladders/ropes/scaffolds, must avoid concentrated exposure to hazards such as machinery and heights and is limited to occasional handling with the non-dominant left hand.

6. [Plaintiff] is unable to perform any of his past relevant work (20 CFR § 416.965).

7. [Plaintiff] was "closely approaching advanced age" as of his alleged disability onset date. [Plaintiff] is cur-

---

**2.** "Every ... disabled individual who is determined ... to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this subchapter, be paid benefits by the Commissioner of Social Security." 42 U.S.C. § 1381a.

**3.** "[A]n individual shall be considered to be disabled ... if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

**4.** Hereinafter known as "the Regulations."

rently an individual of "advanced age" (20 CFR § 416.963).

8. [Plaintiff] has a high school (or high school equivalent) education (20 CFR § 416.964).

9. [Plaintiff] does not have any transferable skills (20 CFR § 416.968).

10. [Plaintiff] has the residual functional capacity to perform a significant range of medium work (20 CFR § 416.967).

11. Although [plaintiff's] exertional limitations do not allow him to perform the full range of medium work, using Medical–Vocational Rules 203.15 and 203.22 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a woodworking assembler (800,000 jobs nationally and 60 in the local economy); office cleaner (1 million jobs nationally and 5000 jobs in the local economy) and dining room attendant (500,000 jobs nationally and 1500 jobs in the local economy)[.]

12. [Plaintiff] was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(*Id.* at 19–20) On February 18, 2005, the Appeals Council denied plaintiff's request for review of the ALJ's decision, making it "the final decision of the Commissioner of Social Security." (*Id.* at 5) Plaintiff filed suit in the United States District Court for the District of Delaware within sixty days of receiving the denial, as required by 20 C.F.R. § 422.210(c). (D.I.2)

**B. Medical Evidence**

Plaintiff was admitted to the hospital on June 24, 2002 after having a seizure relat-

ed to alcohol withdrawal. (D.I. 10 at 141) He was discharged two days later after a CT scan and EEG came back within normal limits; an MRI administered during the same hospital stay showed some atrophy in plaintiff's brain, as well as the absence of any lesions or cerebral hemorrhaging. (*Id.*) Plaintiff testified that he has not had any alcohol since his seizure. (*Id.* at 36) Plaintiff began experiencing headaches after his seizure. (*Id.* at 167) An August 20, 2002 report from the Delaware Disability Determination Service stated that, "per treating doctor [plaintiff] should return to work, but restricted to small job[s]." (*Id.* at 168)

In October 2002, plaintiff had "a temporal artery biopsy which was negative for arteritis"; according to his doctor, plaintiff also reported "continued cranial pressure and soreness of the scalp on the left side." (*Id.* at 171) Likewise, plaintiff reported "intermittent episodes of dizziness, particularly after arising from sitting for a significant period of time." (*Id.* at 174) After the biopsy, plaintiff had a carotid duplex which, despite his continued headaches, showed results within normal limits. (*Id.* at 175)

A December 11, 2002 report by Dr. Robert Sergott stated that, about a week after plaintiff was hospitalized for the seizure, "he began to have some rather constant left sided parietal occipital pain. There has also been rather constant ringing in his left ear." (*Id.* at 179) According to Dr. Sergott, a specialist in Neuro–Opthalmology, plaintiff "ha[d] been taking medication. Maxalt does help him during the day.... [Plaintiff] also noticed that activity will help him as well." (*Id.*) Dr. Sergott could not find "any primary neuro-ophthalmic reason for [plaintiff's] loss of vision" and suspected that "[it might] be related to some cervical spine disease" or "thyroid

disease[,] which on rare · occasions can present with headaches." (*Id.* at 180)

In February 2003, Dr. Eric Tamesis reported that plaintiff continued to have headaches and ringing in his ear and still felt "weak and dizzy upon getting up from a seated position." (*Id.* at 182) Plaintiff reported that taking the drug Neurontin "may have helped some." (*Id.*) Plaintiff had a Tilt Table Evaluation on March 5, 2003; he reported that, after "sitting awhile [and] then standing[,] he [felt] lousy" and "fatigued." (*Id.* at 197) The initial impression of the technician administering the evaluation was that it was an "[a]bnormal test with reproduction of the patient's symptoms." (*Id.*) A CT scan done in March 2003 revealed that plaintiff was suffering from sinusitis. (*Id.* at 205) On April 8, 2003, plaintiff saw Dr. Jay Freid, who reported that, in addition to headaches and sinusitis, plaintiff had "occasional knee pain, and . . . some numbness, because he [was] leaning on a lot [sic] on his back while working as a carpenter, he [was] on his knees up a lot, [and] he still [got] a little bit tired at times." (*Id.* at 211) On May 9, 2003, Dr. Cedric T. Barnes reported to Delaware Health and Social Services that plaintiff was unable to work at his usual occupation because of "vertigo; chronic headaches; depression; [and] carpal tunnel"; the doctor estimated that said illnesses would last more than twelve months. (*Id.* at 285)

On August 7, 2003, plaintiff had a "[l]eft and right endoscopic maxillary antrostomy and left and right endoscopic ethmoidectomy" in an attempt to correct "[c]hronic maxillary and ethmoid sinusitis." (*Id.* at 250) A contemporaneous medical report stated that plaintiff's "severe headache . . . improve[d] when he [was] on an antibiotic." (*Id.* at 253) Sometime around the end of August 2003, a State medical agency consultant evaluated plaintiff's records and completed a Physical Residual Functional Capacity Assessment, stating that plaintiff was physically capable of: (1) occasionally lifting or carrying fifty pounds; (2) frequently lifting or carrying 25 pounds; (3) standing or walking for a total of about six hours of an eight hour workday; and (4) sitting for six hours in an eight hour workday. (*Id.* at 257) The consultant likewise concluded that plaintiff had carpal tunnel syndrome which somewhat limited plaintiff's use of his upper extremities. (*Id.*) The report further suggested that plaintiff refrain from: (1) climbing on ladders, ropes, or scaffolds; (2) continuously engaging in tasks requiring "[h]andling (gross manipulation)" or "[f]ingering (fine manipulation)"; and (3) any exposure to hazards such as machinery or heights. (*Id.* at 258–60) In the evaluator's opinion, plaintiff's limitations were "attributable . . . to a medically determinable impairment." (*Id.* at 261) A Psychiatric Review dated September 2, 2003 found that plaintiff's mild depression and alcohol withdrawal were not severe and constituted "[a] medically determinable impairment . . . that [did] not precisely satisfy the diagnostic criteria" for disabling affective disorders as promulgated in the Regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.00 *et seq.* (D.I. 10 at 268)

Plaintiff had another sinusitis-related surgery on October 2, 2003. (*Id.* at 298) A second Psychiatric Review, completed on January 6, 2004, again concluded that plaintiff's depression was not severe and did not meet the statutory definition of a "disability." (*Id.* at 310, 313) Plaintiff underwent a third surgical procedure for chronic sinusitis on February 5, 2004. (*Id.* at 329) All the while, plaintiff continued to complain of headaches in the left temporal area of his head. (*Id.* at 370)

Jack Dilts, D.O., of the Delaware Disability Service, examined plaintiff on

March 2, 2004. His impressions of plaintiff's condition included chronic headaches (secondary to chronic sinusitis), chronic sinusitis with ethmoid polyp, carpal tunnel syndrome, and depressive personality. (*Id.* at 372) A Physical Residual Functional Capacity Assessment dated March 10, 2004 found that plaintiff still could not lift or carry more than fifty pounds on an occasional basis nor more than twenty-five pounds on a frequent basis. It likewise concluded that plaintiff had an unlimited ability to push or pull and could stand, walk, or sit for six hours in an eight hour workday. The report again found that plaintiff should not climb on ropes, ladders, or scaffolding; should avoid hazards like machinery; and was limited in his ability to engage in the gross manipulation of objects. (*Id.* at 374–81)

On March 29, 2004, Dr. Nicholas J. Berg opined that, due in part to plaintiff's repeated sinus problems,

> from June, 2002 until the present, [plaintiff's] conditions were such that they prevented him from doing any kind of work on a normal everyday basis. The pain that he was suffering ... would have ... prevented him from concentrating sufficiently to work any kind of job. Furthermore, because of the imbalance that was being caused by his condition, he could not do any kind of work involving physical activity[ ] while standing[.]

(*Id.* at 384) Dr. Berg expressed the same opinion in October of that year, adding that plaintiff "also suffers from arthritis and carpal tunnel syndrome," which "would make it even more difficult for [plaintiff] to do any kind of competitive work." (*Id.* at 410)

## C. Facts Evinced at the Hearing

Plaintiff was 53 years old at the onset of his alleged disability and 56 at the time of the Hearing; he is now 58 years old. (D.I. 10 at 82) Plaintiff is a high school graduate but has never had any formal job training. (*Id.* at 29–30) He stands 5′8″ tall and, at the time of the Hearing on October 20, 2004, weighed 200 pounds. (*Id.* at 29) Plaintiff worked as carpenter until June 2002, when he suffered an alcohol-related seizure; he has not "done any work for pay" since that time because of, *inter alia,* chronic sinus problems. (*Id.* at 31)

Plaintiff testified that, despite multiple surgeries and the use of antibiotics and Darvocet, he continues to have constant, "terrible pain" in his left temple. (*Id.* at 32–33) Likewise, plaintiff stated that his condition made him "tired, [and] fatigued all the time" and "affect[ed] his brain function." (*Id.* at 33) Plaintiff, who is right-handed, also reported having carpal tunnel syndrome in his left wrist. (*Id.* at 33–34) According to plaintiff, his fatigue was so bad that he had to lie down several times during the day. (*Id.* at 37) Despite this, plaintiff estimated that he could lift about twenty pounds and affirmed that he was still able to bend forward at the waist, kneel, crouch, squat, and stoop over and pick something up off the floor. (*Id.* at 38) Plaintiff stated that, while he did chores around the house and ran errands (such as cooking, cleaning, and grocery shopping), he did not engage in yard work and allowed his son to take care of his finances. (*Id.* at 39–40) Lastly, plaintiff testified that his extreme fatigue rendered him physically and mentally unable to do any kind of job for forty hours a week. (*Id.* at 43)

## D. Vocational Evidence

A vocational expert named Beth Kelley testified at the Hearing and affirmed that she had "enough information to form an opinion as to [the] exertional and skill level[s] of [plaintiff's] past relevant work[.]" (D.I. 10 at 44) Kelley stated that plaintiff's

past employment as a carpenter was "skilled work" and required a medium level of exertion. (*Id.*) The ALJ then asked Kelley

> to consider a hypothetical individual who is approximately [plaintiff's] stated age at onset, of 53 years. This individual has a high school education, [and] the work history you've just cited. There are certain underlying impairments, and these impairments limit the individual to working at a medium level of exertion. This individual has posturally, he should never climb a ladder, a rope, or a scaffold. [He][s]hould avoid concentrated exposure to hazards, and would have limited handling ability with the left hand. The person is right-hand dominant. Would there be any—could this person do the [plaintiff's] past relevant work in your opinion?

(*Id.*) Kelley indicated that, with those restrictions, plaintiff would not be able to engage in his past relevant work. (*Id.* at 45)

Despite the above finding, Kelley opined that "there would be a wide range of unskilled work, and there would be a range of semi-skilled work using some of [plaintiff's] skills, in terms of woodworking assemblers, and repairers. And in the region there would be approximately 60 of these occupations at light and medium [exertion levels]." Kelley estimated that there were approximately 800,000 such jobs on the national level. Moreover, Kelley stated that plaintiff would be able to perform "unskilled work" at a medium level of exertion. (*Id.*) In Kelley's opinion, there were 5,000 of these jobs available locally and "over a million nationally." (*Id.* at 45–46) When questioned by plaintiff's attorney, however, Kelley acknowledged that, if plaintiff's testimony were deemed credible, there would be no work available for him because his fatigue

"would preclude appropriate attendance at any [full-time] competitive employment." (*Id.* at 46)

## III. STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir.1986). In making this determination, a reviewing court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190–91.

■ The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 555, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Fed. R.Civ.P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians) -or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)). Where, for example, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir.1990).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), as amended, "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

In *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If the claimant is found to be engaged in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her im-

pairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

*Id.* at 427–28 (internal citations omitted). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a).

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

### 1. Application of the Five–Step Test

In the case at bar, the ALJ determined that: plaintiff has not engaged in substantial gainful activity since his alleged disablement; his medical condition qualifies as "severe"; his claimed ailments are not on the list of impairments which are presumptively disabling; and he is unable to engage in his past relevant work. (D.I. 10 at 19) Thus, plaintiff is not disqualified from receiving SSI under steps one through four of the five-step test. Plaintiff's complaint, therefore, essentially challenges the ALJ's finding with respect to step five, that there are other jobs with significant numbers in the national economy which plaintiff can still perform. (*Id.*) Plaintiff avers that the ALJ erred in finding that plaintiff's disability claims were not wholly credible; giving too much credence to State agency medical consultants and the testimony of the vocational specialist; and not giving enough weight to the opinion of Dr. Berg, one of plaintiff's treating physicians. (D.I. 13 at 26, 23, 30, 14) Plaintiff likewise maintains that the ALJ's finding that he was capable of performing "medium work" was faulty. (*Id.* at 25)

### 2. Plaintiff's Credibility

The ALJ found that plaintiff's claims were not wholly credible

to the extent that he has described limitations which exceed what is shown or can reasonably be expected from the overall medical evidence of record as summarized in the text of this decision, as well as his self-reported activities of daily living. These activities include [plaintiff], who lives with his son, shopping for groceries, doing laundry, cleaning, driving for simple errands in his car, visiting his mother in a nursing home, and cooking daily, according to his testimony. Additionally, the claimant drove himself to the [H]earing....

(D.I. 10 at 15) In her report, the ALJ referenced comments made by plaintiff to

Dr. Joel Rutenberg and Dr. Jay Freid, both of whom evaluated him at various stages during his course of treatment. According to the ALJ, plaintiff's statements that, for example, "his prescribed medications 'help[ed] quite a bit'" and "he had a 50% overall improvement in his head pain following his sinus surgery," contradicted both plaintiff's and Dr. Berg's contentions that plaintiff was continually disabled by the pain in his head. (D.I. 10 at 16) In addition, the ALJ made note of several of plaintiff's statements, as reflected in the medical reports of Dr. Rutenberg and Dr. Freid, that he was "trying to work a few hours and was thinking of a career change, possibly into real estate," or that he "was doing some home improvement work with a relative." (*Id.* at 17) The ALJ contended that these "numerous references throughout the record regarding possible work activity" discredited the notion that plaintiff was somehow unable to work in any capacity. (*Id.*)

Plaintiff maintains that the energy required to perform the activities listed by the ALJ is very different from that required by a forty-hour work week, and that three different doctors have stated that he is not able to work because of the pain in his head and various other ailments. (D.I. 13 at 27) While he admits that he can perform the daily activities identified by the ALJ, plaintiff asserts that "none of them are sustained," and the fact that he can perform small household tasks "does not mean that he can sustain regular activity." (*Id.* at 28)

 When an ALJ is confronted with subjective complaints of pain, the United States Court of Appeals for the Third Circuit requires:

(1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence; (2) that subjective pain may support a claim for disability benefits and may be disabling; (3) that where such complaints are supported by medical evidence, they should be given great weight; and (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence.

*Green v. Schweiker,* 749 F.2d 1066, 1068 (3d Cir.1984) (citations and quotations omitted). Although "[a]n ALJ must give serious consideration to claimant's subjective complaints of pain," *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir.1993), subjective complaints of pain "do not in themselves constitute disability," *Green,* 749 F.2d at 1070 (emphasis in original). Subjective complaints of pain are given "great weight" unless there is conflicting medical evidence. *See Mason,* 994 F.2d at 1067–68. When a claimant's subjective complaints of pain indicate a greater severity of impairment than the objective medical evidence supports, the ALJ can give weight to factors such as physician's reports and claimant's daily activities. *See* 20 C.F.R. § 404.1529(c)(3) (1995).

**3. Weight Given to Various Professionals by the ALJ**

 "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000). "Where a treating source's opinion on the nature and severity of a claimant's impairment is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record,' it will be given 'controlling weight.'" *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir.2001). "Where ... the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the

ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " *Morales,* 225 F.3d at 317 (citing *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir.1999)). "The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled." *Id.* If the ALJ chooses to reject the treating physician's assessment, the ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer,* 186 F.3d at 429.

### a. Plaintiff's Treating Physicians

In her written decision, the ALJ found "that Dr. Berg's opinion [was] not supported by the totality of the medical evidence, including his own detailed treatment records, and [was] inconsistent with [plaintiff's] rather extensive activities of daily living." (D.I. 10 at 15) In support of this finding, the ALJ cited, *inter alia:* (1) various instances wherein plaintiff told his treating physicians that certain medications and each of his sinus-related surgeries had relieved some of the pain in his head; (2) lack of evidence that plaintiff had "weakness in the upper or lower extremities"; (3) plaintiff's "extensive activities of daily living"; and (4) the fact that "[n]o clinical signs or symptoms of fatigue or cognitive defects as a result of decreased concentration have been reported by any treating or examining physician." (*Id.* at 15–16) "Consequently," the ALJ decided, "Dr. Berg's opinion [was] not supported by the substantial evidence of record, [and was] not accorded any significant weight." Moreover, she opined, "the question of disability is reserved to [defendant]," the Commissioner of the Social Security Administration. (*Id.* at 16)

In addressing plaintiff's claim that carpal tunnel syndrome contributed to his inability to work, the ALJ referenced reports from Dr. Paul J. Harriott, another of plaintiff's examining physicians. (*Id.*) According to the ALJ, when plaintiff was seen by Dr. Harriott on April 27, 2004, he "reported only occasional tingling in the small and ring fingers of [his] left hand. Dr. Harriott reported that [plaintiff] had full sensation in his left hand ... and good grip strength." (*Id.*) "As of his last recorded visit with Dr. Harriott on August 10, 2004, [plaintiff] was reporting only intermittent numbness in his left hand.... No carpal tunnel surgery has been scheduled or performed." (*Id.*) This, along with the fact that plaintiff is right-handed and wears a wrist brace at night, led the ALJ to conclude that plaintiff's "moderate left carpal tunnel syndrome, although improved with treatment and not requiring any surgery, may impose some limitations in more than occasional handling with the left, non-dominant hand." (*Id.* at 17)

### b. State agency medical consultants

State agency medical consultants prepared two different evaluations of plaintiff's condition, the first on August 27, 2003, and the second dated March 10, 2004. (D.I. 10 at 256, 374) Both consultants concluded that plaintiff was able, with some limitations, to perform work at a medium level of exertion. (*Id.*) The ALJ "accept[ed] as persuasive the opinions of the State agency medical consultants ..., as their opinions are well supported by the record as a whole, including detailed treatment notes and objective studies ..., as well as [plaintiff's] self-reported activities of daily living, which are not inconsistent with the ability to perform medium level work." [5] (*Id.* at 17)

---

**5.** The court notes, however, that the consul-

tants' "reasoned judgment[s]" were based

#### c. Beth Kelley (vocational expert)

Beth Kelley's finding that the local and national economies offered a "wide range" of unskilled jobs suited to someone with plaintiff's exertional limitations was derived from her analysis of a hypothetical posed to her by the ALJ. (D.I. 10 at 44–45) The ALJ, giving much credence to Kelley's testimony, decided that plaintiff was "not disabled" under the relevant guidelines because, "considering [plaintiff's] age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy." (*Id.* at 18)

According to the Third Circuit, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987). The appellant in *Chrupcala* "argue[d] that the vocational expert's opinion [that he was able to perform certain jobs] was deficient because it failed to take account of all of appellant's impairments." The court agreed, finding that "[t]he hypothetical question that the ALJ posed did not reflect the fact of constant and severe pain which appellant testified to and which ... was supported by objective medical findings in the record." *Id.* In 2005, the Third Circuit clarified that the *Chrupcala* line of cases

> do[es] not require an ALJ to submit to the vocational expert every impairment **alleged** by a claimant. Instead[,] ... the hypotheticals posed must "accurately portray" the claimant's impairments and ... the expert must be given an opportunity to evaluate those impair-

ments "as contained in the record." ... Fairly understood, such references to all impairments encompass only those that are medically established.... And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's **credibly established limitations**.

*Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir.2005) (emphasis in original) (internal citations and footnotes omitted).

In *Snow v. Apfel*, No. Civ. A. 99–602–RRM, 2000 WL 33340965 (D.Del.2000), the court upheld as proper an exchange in which the ALJ "subjected [the vocational expert] to a three-part line of questions that progressively worked toward evaluating all the limitations that [the claimant] claimed. The first two questions were hypothetical to the extent that they did not incorporate every deficiency alleged by [the claimant]. The third question reflected every mental and physical impairment that [the claimant] claimed during her testimony." *Id.* at *6. According to the court, the ALJ's "three-part line of questions served to provide intermediate opinions to span the range of [the claimant's] alleged deficiencies and to test the basis of [the expert's] conclusions."

Although the crux of plaintiff's disability claim is that he suffers from severe and near-constant pain in his head (to which he attributes other ailments such as extreme fatigue), the ALJ's hypothetical question made reference only to the functional limitations identified by the State agency medical consultants and "certain underlying impairments" that "limit[ed] [plaintiff] to working at a medium level of exertion." At no point in her hypothetical question to Kelley did the ALJ mention that plaintiff

---

solely on evidence contained in plaintiff's file, such as "clinical and laboratory findings; symptoms; observations; lay evidence; [and]

reports of daily activities" (D.I. 10 at 256, 374), rather than on personal physical examinations of plaintiff himself.

had been complaining of disabling headaches and fatigue for years.

### 4. Plaintiff's Ability to Perform Medium Work [6]

Lastly, plaintiff contends that the ALJ erred when she concluded that plaintiff could perform work at a medium level of exertion. (D.I. 13 at 25) Specifically, he argues that his "significant non-exertional impairments" (*i.e.*, his headaches and fatigue) made it improper for the ALJ to rely exclusively on the Medical–Vocational guidelines ("grids") set forth in the Regulations. (*Id.*)

The Third Circuit has stated that the Commissioner of Social Security cannot meet her burden of showing that a claimant can still perform jobs in the local and national economies "by relying exclusively on the grids when the claimant has both exertional and nonexertional impairments." [7] *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir.2000) (citing *Burnam v. Schweiker*, 682 F.2d 456, 458 (3d Cir. 1982)). The Third Circuit later recognized, however, that

> [a]fter the *Sykes* opinion, the [Social Security Administration ("the Agency") ] issued an Acquiescence Ruling to specifically address how the Agency would deal with issues of this kind in cases within the geographic limits of the Third Circuit. There, the Agency noted that, thereafter, at Step 5 [of the test], the Agency would not use the grid framework exclusively when there were nonexertional limitations, but would, in addition:
>
> > (1) Take or produce vocational evidence, such as from a vocational expert, the DOT, or other similar evidence (such as a learned treatise); or
> >
> > (2) Provide notice that we intend to take or are taking administrative notice of the fact that the particular nonexertional limitation(s) does not significantly erode the occupational base, and allow the claimant the opportunity to respond before we deny the claim.

*Allen v. Barnhart*, 417 F.3d 396, 404 (3d Cir.2005) (quoting *Sykes v. Apfel; Using the Grid Rules as a Framework for Decisionmaking When an Individual's Occupational Base is Eroded by a Nonexertional Limitation–Titles II and XVI of the Social Security Act*, AR 01–1(3), 2001 WL 65745, at *4 (S.S.A. Jan. 25, 2001)).

The court finds that plaintiff's subjective complaints of pain and fatigue are credibly established nonexertional limitations; therefore, under *Sykes* and the Agency's Acquiescence Ruling, the ALJ was required to rely on more than just the grids themselves in making her determination that plaintiff was capable of performing medium work despite his headaches and

---

**6.** Under the Regulations, "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, . . . he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c).

**7.** In her decision, the ALJ stated that the grids "are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations." (D.I. 10 at 18) In determining that plaintiff was "capable of performing a significant range of medium work" (*id.*), the ALJ took into account the fact that plaintiff "is restricted to no climbing of ladders/ropes/scaffolds, must avoid concentrated exposure to hazards such as machinery and heights and is limited to occasional handling with the non-dominant left hand" (*id.* at 15). The ALJ did not include plaintiff's claims of pain and fatigue in this list of nonexertional limitations because, in her opinion, they were not wholly credible. (*Id.*)

fatigue. The ALJ looked outside of the grids by employing a vocational expert; however, her hypothetical question made no mention of plaintiff's claims of disabling pain and fatigue. Because the ALJ failed to elicit the vocational expert's opinion on the potential effects of said nonexertional limitations, her hypothetical question was "deficient." As a result, the expert's finding that there were jobs in the local and national economies that plaintiff was capable of performing "cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987).

### 5. Analysis

The ALJ ultimately concluded that, irrespective of the opinion of plaintiff's treating physician, Dr. Berg, plaintiff was not disabled because of his self-reported daily activities, statements he made to his doctors, and the evaluations completed by the State medical consultants. If an ALJ chooses to reject a treating physician's assessment, she may not make "speculative inferences from medical reports" and may reject "[the] treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir.1999). Other than the conclusions of State consultants who did not personally examine plaintiff, the conflicting medical evidence upon which the ALJ's determination was based is apparent neither from the record nor from the ALJ's explanation of her findings. Instead, plaintiff's testimony and medical records indicate that, while he does occasionally experience some relief from his ailments, such relief is only temporary (as shown by the fact that plaintiff was forced to undergo surgical procedures for chronic sinusitis three times in a six-month period). Dr. Berg's opinion that plaintiff's ailments make him unable to work is " 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and

is not inconsistent with the other substantial evidence in [plaintiff's] case record' "; therefore, the court will give it " 'controlling weight.' " *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir.2001).

 The court finds that the ALJ in the case at bar failed to give proper weight to plaintiff's lengthy and well-documented complaints of subjective pain and fatigue and did not include all of plaintiff's credibly established nonexertional limitations in her hypothetical question to the vocational expert. The vocational expert herself admitted that, if plaintiff's testimony were deemed credible, he would be unable to work "because he indicated he was lying down a couple of times a day, because of the terrible fatigue. And that would preclude appropriate attendance at any competitive employment." (D.I. 10 at 46) Consequently, the ALJ's (and, by accepting the ALJ's findings, defendant's) determination that plaintiff was not disabled under the final step of the five-part test was not supported by substantial evidence.

## V. CONCLUSION

Because defendant has failed to meet her burden of proof with respect to the final prong of the five-step test for determining the existence of a disability under the Social Security Act, plaintiff's motion for summary judgment (D.I.12) is granted and defendant's motion for summary judgment (D.I.15) is denied. An appropriate order shall issue.

### ORDER

At Wilmington this 9th day of January, 2007, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that plaintiff's motion for summary judgment (D.I.12) is granted and defendant's motion for summary judgment (D.I.15) is denied. The Clerk of

Court is directed to enter judgment in favor of plaintiff Dewey Whitmore and against defendant Jo Anne B. Barnhart.